# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

R. ALEXANDER ACOSTA,
        **Plaintiff,**

    **v.**

CENTRAL LAUNDRY, INC., GEORGE
RENGEPES AND JAMES RENGEPES,
        **Defendants.**

CIVIL ACTION

NO.  18-190

## OPINION

This case is the second lawsuit filed by the Secretary of Labor against George and James Rengepes and their business Central Laundry, Inc. (collectively "Defendants"), asserting Defendants violated the Fair Labor Standards Act of 1938 (the "FLSA" or the "Act"), 29 U.S.C. § 201 *et seq*.  Specifically, the Secretary claims that Defendants violated the minimum wage, overtime, recordkeeping, child labor, and anti-retaliation provisions of the FLSA between July 1, 2017 and August 28, 2018 (hereinafter "the relevant time period").  The Secretary now moves for summary judgment on twelve issues relating to those violations.

For the reasons that follow, the motion will be granted in part and denied in part.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Undisputed Facts[1]

James and George Rengepes operated a large industrial laundry facility in Lansdowne, Pennsylvania, which provided laundry services to restaurants and hotels.  They employed a range of employees, including laundry workers, drivers, mechanics, and managers.  Many of the workers pivotal to the purported FLSA violations in this case were Hispanic or Cambodian.

---

[1] Defendants, in their statement of undisputed material facts, "object" to certain facts offered by the Secretary as "immaterial and irrelevant," but do not deny their truth.  For purposes of resolving this motion, such facts will be taken as undisputed.

Additionally, homeless workers who George recruited from the local shelter were an important part of Central Laundry's operations and are central to certain issues in this case.

By way of background, in March 2015, the Secretary filed suit against Defendants in a related action, alleging they willfully violated the FLSA's minimum wage, overtime, and recordkeeping provisions. This Court granted summary judgment to the Secretary, concluding, *inter alia*, that: Central Laundry and George and James Rengepes violated the minimum wage, overtime, and recordkeeping provisions of the FLSA; that Defendants' minimum wage and overtime violations were "willful" and that their conduct was not in "good faith"; and that Defendants were therefore liable for both back wages and liquidated damages. *Central Laundry I*, No. 15-1502, ECF No. 56. The case proceeded to a bench trial on the amount of damages and injunctive relief, following which the Court entered judgment against Defendants for $239,269.65 in back wages and another $239,269.65 in liquidated damages, and granted the Secretary's request to enjoin Defendants from violating the minimum wage, overtime, and recordkeeping provisions of the FLSA. *Central Laundry I*, ECF No. 111; *see also Acosta v. Central Laundry*, 2018 WL 1726613, at *10-11 (E.D. Pa. Apr. 10, 2018). The monetary judgment has not been paid.

In January 2018, the Secretary filed a new Complaint, which is at issue here. The Secretary again alleges that Defendants violated and continue to violate the FLSA, this time with respect to minimum wage, overtime, child labor, discrimination and retaliation against employees, and maintenance of records. Following a hearing to show cause why a preliminary injunction should not issue against Defendants, the Court enjoined Defendants from: selling or shipping in interstate commerce goods that were produced by child labor, or by employees not paid minimum wage and overtime compensation in violation of the FLSA; employing minors in

violation of the FLSA; failing to pay minimum wage and overtime compensation; failing to make, keep, and preserve records of payment to employees, as required by the FLSA and its implementing regulations; and, threatening or intimidating employees who pursue their rights under the FLSA.

Following the issuance of the preliminary injunction, the parties agree that on March 20, 2018, James Rengepes's wife Angeliki Rengepes incorporated a new business called GNNE, Inc., doing business as Liberty Linen and Laundry Service, and that Central Laundry sold its assets to GNNE on that day.[2]

### B. Key Disputed Facts

The parties are at odds on a variety of factual matters. The principal dispute, however, concerns the relationship of GNNE to Central Laundry.[3] This relationship is critical to many of the issues in this case because, as discussed at length below, while Defendants concede liability for many of the violations alleged to have occurred pre-March 20, 2018, they assert that any liability ceased once Central Laundry closed and GNNE opened.

The Secretary asserts that GNNE "was essentially Central Laundry . . . with a new name." The Secretary claims that GNNE did "the exact same work" used "the same laundry machines," "stored materials in the same warehouse," "kept many of the same employees," and "had the same operations, equipment [and] customers" as Central Laundry. The Secretary further claims that business carried on uninterrupted during the time that the worksite transitioned from Central Laundry to GNNE, that Defendants "assured Central Laundry

---

[2] There appeared to be some dispute between the parties as to whether the date Central Laundry closed and GNNE opened was March 20, 2018 or March 27, 2018. However, the Secretary eventually acknowledges in his Reply Statement of Undisputed Material Facts that it is undisputed that GNNE was incorporated on March 20, 2018 and that the sale of Central Laundry's assets to GNNE occurred on March 20, 2018.

[3] Additional factual disputes will be addressed below in the discussion section as they relate to individual legal issues.

employees that they would have continued employment with GNNE, if they wanted it," that George and James "were at the worksite every day from March through August 2018," that "James Rengepes continued to supervise, assign, and direct the work of GNNE, Inc's floor-workers . . . just as he had for Central Laundry[,]" and that "George Rengepes remained in charge of the restaurant customer accounts that he had developed over many years for Central Laundry [and] continued to recruit, hire, supervise, direct, pay, and keep cursory records of the homeless people he hired as day-laborers." In sum, the Secretary asserts that GNNE continued the same FLSA violations that Central Laundry had been enjoined by the Court from committing, and that GNNE was "a transparent attempt to continue business as usual, while avoiding the consequences of the Court's judgment in *Central Laundry I* and the preliminary injunction in the present case."

Defendants deny this contention. They state that many of the facts asserted by the Secretary are false, and instead claim that "George and James merely helped [Angeliki] and were hardly employees within the meaning of the FLSA on or after March 20, 2018[.]" They also emphasize that Angeliki "owned, operated and managed" GNNE, that she entered a commercial lease agreement with George and Ourania Rengepes (George's wife) for the worksite, that GNNE "entered into an asset sale agreement with Central to buy its assets," and that Angeliki "wanted full and total control of the laundry and made sure that George and James were out of the business."

## II.    LEGAL STANDARD

Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir. 1989). Materiality of facts is determined by

reference to the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute "exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *U.S. ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 93 (3d Cir. 2018) (internal quotation marks omitted). "[A]ll reasonable inferences" must be drawn in the non-moving party's favor. *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).

## III.    DISCUSSION

The Secretary seeks summary judgment against Defendants on the following twelve issues relating to conduct during the "relevant time period": (1) George and James are employers under the FLSA and therefore jointly and severally liable for FLSA violations, 29 U.S.C. § 203(d); (2) Central Laundry is a covered enterprise under the FLSA, *id.* at § 203(s)(1); (3) Defendants violated the minimum wage provisions of the FLSA, *id.* at § 206(a); (4) Defendants violated the overtime provisions of the FLSA, *id.* at § 207(a)(1); (5) Defendants violated the child labor provisions of the FLSA, *id.* at § 212(c); (6) Defendants violated the recordkeeping provisions of the FLSA, *id.* at § 211(c);[4] (7) Defendants violated the anti-retaliation provisions of the FLSA, *id.* at § 215(a)(3); (8) Defendants are liable to various employees for $133,335 in minimum wage and overtime back wages, *id.* at § 216(b); (10) Defendants are liable for an additional $133,335 in liquidated damages, *id.*; (11) Defendants owe former employee Adam Nickels $57,967.50 in front pay as a result of James Rengepes's retaliatory firing in violation of the anti-retaliation provisions of the FLSA, *id.* at § 216(b); and, (12) Defendants' violations warrant permanent injunctive relief, *id.* at § 217.

---

[4] Defendants fail to address the recordkeeping violations, and thus have conceded this claim. *See Acosta v. Osaka Japan Restaurant, Inc.*, 2018 WL 3397337, at *15 (E.D. Pa. July 12, 2018). Summary judgment will be entered against Defendants on this issue. *See* Fed. R. Civ. P. 56(e)(2), (3).

### A. Covered Employers under the FLSA

In order for George and James to be individually liable under the FLSA, they must be "employers" as defined by the Act; the Secretary contends that there is no genuine dispute of material fact as to whether they qualify as employers under the statute.

The FLSA defines an employer as: "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d). To determine whether a defendant is a covered employer under the Act, the Third Circuit has adopted an "economic realities" test, which requires analysis of whether the purported employer has "(1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like." *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 469 (3d Cir. 2012). These factors, however, are not "exhaustive" and should not be "blindly applied"—"[i]f a court concludes that other indicia of 'significant' control are present to suggest that a given employer was a joint employer of an employee, that determination may be persuasive[.]" *Id.* (internal quotation marks omitted).

George and James concede that they were employers at Central Laundry prior to March 20, 2018—the day Angeliki incorporated GNNE—but they argue that they were no longer employers after that date and therefore that they cannot be held responsible for any subsequent violations. But even as to the period of time following March 20, Defendants do not make any affirmative argument as to why George and James would not qualify as employers covered by the FLSA. Rather, Defendants employ two strategies: they attempt to undermine the individual

pieces of evidence that the Secretary puts forward, and they advance a separate legal theory squarely rejected by binding precedent.

Beginning with the record evidence supporting employer status, the Secretary identifies numerous pieces of evidence that show that George and James were—and continue to be— employers under the FLSA even after GNNE's incorporation. First, the Secretary points to his First Request for Admissions, where he requested Defendants admit that "during the relevant time period":[5] George and James were "employers" as defined by the FLSA; they "made decisions relating to the compensation policies affecting laundry floor workers, mechanics, drivers, and drivers' helpers[;]" they were "responsible for hiring, firing, scheduling, setting pay rates for, assigning work to, and/or supervising employees at Olympic Linen[;]" and James "made decisions relating to Central Laundry's policy regarding hours worked by Central Laundry employees[.]" Defendants never responded to the First Request for Admissions.

Under Federal Rule of Civil Procedure 36(a)(3), the "[e]ffect of [n]ot [r]esponding" to a request for admission is that the "matter is admitted." It is "well settled that admissions obtained under Rule 36, including matters deemed to be admitted by a party's failure to respond to a request for admissions, can form the basis for granting Summary Judgment" and that "failure to respond to a request for admissions will permit entry of a summary judgment if the facts admitted are dispositive of the case." *Sony Corp. of Am. v. D S Audio, Inc.*, 1988 WL 119601, at *1 (E.D. Pa. Nov. 7, 1988) (citing *Moosman v. Joseph P. Blitz*, 358 F.2d 686 (2d Cir. 1966)); *O'Campo v. Hardisty*, 262 F.2d 621 (9th Cir. 1958)); *see also Sec'y U.S. Dep't of Labor v. Kwasny*, 853 F.3d 87, 91 (3d Cir. 2017) ("Matters deemed admitted due to a party's failure to respond to requests for admission are 'conclusively established' under Federal Rule of Civil

_____
[5] For purposes of the First Request for Admissions, the "relevant time period" was from September 8, 2017 to "the present"—presumably February 21, 2019, the date that the First Request for Admissions was served on Defendants.

Procedure 36(b), and may support a summary judgment motion.") (footnotes omitted).

Defendants do not engage with this "well settled" law, *Sony Corp.*, 1988 WL 119601, at *1, but

instead simply declare—without legal argumentation—that reliance on the First Request for

Admissions "should be rejected out of hand" and that it is "unworthy of consideration by this

Court[.]" Absent legal argument, these assertions have no currency. Accordingly, Defendants

are deemed to have admitted both the legal conclusion that George and James were "employers"

under the FLSA and the various supporting facts about George and James's conduct while

working at Central Laundry and/or GNNE.

Second, the Secretary points to Angeliki's sworn statement, which states that George

"supervised and directed the work of all drivers and drivers' helpers at GNNE" and that James

"supervised and directed the work of the floor workers who operated the various laundry and

ironing machines at GNNE[.]" Defendants contest the admissibility of Angeliki's statement on

grounds of spousal privilege. Federal Rule of Evidence 501 states that "in a civil case, state law

governs privilege regarding a claim or defense for which state law supplies the rule of decision."

Defendants argue that under Pennsylvania law, in the usual course "neither husband nor wife

shall be competent or permitted to testify against each other," 42 Pa. C.S.A. § 5924(a), and that

"neither husband nor wife shall be competent or permitted to testify to confidential

communications made by one to the other," unless privilege is waived by the nontestifying

spouse, *id.* at § 5923. Pennsylvania law, however, does not govern here. Rule 501 makes clear

that state privilege law applies only where "state law supplies the rule of decision" for the

underlying claim, and that otherwise (subject to exceptions not relevant here), "[t]he common

law . . . governs a claim of privilege." In this case, the FLSA—a federal statute—provides the

rule of decision, and thus common law applies. Under federal common law, "one spouse may . .

8

. voluntarily testify against the other." *In re Grand Jury Matter*, 673 F.2d 688, 691 (3d Cir. 1982) (citing *Trammel v. United States*, 445 U.S. 40, 53 (1980) (concluding that "the witness spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying")). Consequently, Angeliki's testimony is not excluded on the basis of spousal privilege.

Third, the Secretary points to George's sworn testimony that: "[f]or GNNE," he would "tell [drivers] what linens to pick up or deliver" and "how much money or checks to pick up;" that for the homeless people GNNE employed, George "kept the same records for GNNE that [he] kept when [he was] doing that for Central;" that George "directed" the work of the homeless employees just as he had at Central Laundry; and that when Angeliki was not at GNNE, George would pay the homeless employees.

Fourth, the Secretary points to James's sworn testimony that even after this Court's injunctions, he continued paying employees in cash and had "no record" of those cash payments. Angeliki confirmed in her sworn statement that James continued paying cash wages to workers after GNNE was incorporated, and she also indicated that James "would manipulate GNNE, Inc. employees' time records to make it appear that they worked few[er] hours than they really did, and to reduce or eliminate the amount of any overtime they were due."

Each piece of evidence relied upon by the Secretary is probative of employer status under the "economic realities" test: Defendants admit that George and James had "hir[ing] and fir[ing]" authority; sworn testimony shows that they "set conditions of employment, including compensation," engaged in "day-to-day supervision" of employees, and were responsible for "control of employee records." More broadly, the extensive evidence presented by the Secretary

represents "indicia of 'significant' control [that] suggest" that George and James were employers. *Enterprise Rent-A-Car*, 683 F.3d at 469.

Beyond their attempts to cast doubt on the admissibility or probative value of certain pieces of evidence (namely the Request for Admissions and Angeliki's sworn statements), Defendants also advance the theory that Angeliki was an "employer," and therefore by implication that Defendants were not "employers." They rely in large part on two sworn declarations made by former drivers for GNNE, Dimitrious Karagiannis and Thomas Fisher. Those declarations both state that the declarants believed that Angeliki owned GNNE, that Angeliki hired them, that they "reported to [Angeliki] the entire time [they] worked for GNNE," that Angeliki "directed [their] work as a driver at GNNE and would tell [them] which customers and which routes [they] would take on the days that [they] worked at GNNE," and that Angeliki "paid [them] on a weekly basis during the time that [they] worked at GNNE." In addition, Defendants rely on Angeliki's own testimony that she engaged in activity probative of "employer" status, such as hiring and firing certain employees. This approach fails because whether Angeliki was an "employer" and whether Defendants were "employers" are two independent questions; one does not determine the answer to the other in that, under the FLSA, an employee may have "multiple employers that are simultaneously responsible for compliance with [the Act]." *Davis v. Abington Mem'l Hosp.*, 817 F. Supp.2d 556, 563 (E.D. Pa. 2011); *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014); 29 C.F.R. § 791.2(b). Thus, even if Angeliki were also an employer, that would not undercut the Secretary's evidence that George and James were *also* employers.

In sum, the Secretary points to undisputed evidence that, even after GNNE was incorporated and operating, James and George met the factors of the "economic realities" test

described in *Enterprise Rent-A-Car*. Defendants have raised no genuine question of material fact as to whether James and George were employers. Therefore, summary judgment will be granted; James and George were covered employers under the FLSA for the full "relevant time period."

### B. Central Laundry was a Covered Enterprise prior to March 20, 2018

The Secretary also seeks summary judgment as to Central Laundry's responsibility for FLSA violations throughout the "relevant time period," *i.e.*, both before and after GNNE was incorporated. Only certain defined "enterprises" are covered by the FLSA: In order to be a "covered enterprise" for purposes of the FLSA, the enterprise must, *inter alia*, have a "gross volume of sales made or business done . . . not less than $500,000[.]" 29 U.S.C § 203(s)(1)(A)(ii). Defendants do not contest that Central Laundry was an enterprise covered by the FLSA prior to March 20, 2018. However, they appear to contest whether Central Laundry was covered by the statute, and therefore responsible for any violations, after March 20. The Secretary, for his part, offers no argumentation specific to the post-March 20 time period.

While unclear due to the parties' lack of argumentation on the issue, it appears that Central Laundry sold all of its assets to GNNE on March 20, 2018, and from that point forward Central Laundry made no "sales" and did no "business;" consequently, from March 20, 2018 forward, Central Laundry would not have had a "gross volume of sales made or business done . . . not less than $500,000[.]" *Id.* In any event, the Secretary does not point to specific evidence in the record that would indicate Central Laundry satisfied the criteria for a "covered enterprise" during the post-March 20 period; and, as GNNE is not a party to this case, its sales do not help satisfy the gross sales requirement.[6] As factual issues remain outstanding, summary judgment

---

[6] Although the Secretary contends that Central Laundry and GNNE are essentially the same enterprise—he asserts that the creation of GNNE was merely "a transparent attempt to continue business as usual, while avoiding the consequences of the Court's judgment in *Central Laundry I* and the preliminary injunction in the present case"—he provides no argument for why that fact would cause GNNE to qualify as a "covered enterprise" under the FLSA's

will be denied to the Secretary on the question of whether Central Laundry was a covered enterprise after March 20, 2018.

### C.  Minimum Wage

The Secretary seeks summary judgment as to Defendants' liability for minimum wage violations, contending that there is no dispute of material fact as to whether Defendants violated the FLSA's minimum wage requirement during the relevant time period.[7]  The FLSA mandates employees be paid a minimum wage of $7.25 per hour.  29 U.S.C. § 206(a).  Wages are not considered paid for purposes of the FLSA until the employee receives the wages "finally and unconditionally."  29 C.F.R. § 531.35; *see also Solis v. A-1 Mortg. Corp.*, 934 F. Supp.2d 778, 798 (W.D. Pa. 2013).  A defendant may be liable for minimum wage violations where employees do not "receiv[e] their proper wages at the time they were due."  *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1299 (3d Cir. 1991); *see also Mathis v. About Your Smile, P.C.*, 2002 WL 1878894, at *2 (E.D. Pa. Aug. 14, 2002) (observing that under the FLSA's minimum wage provisions, "an employer must pay its employees at least minimum wage on payday").

In support of its claim, the Secretary points to a host of evidence, including Defendants' own admissions and sworn testimony from a variety of sources.  Defendants, for their part, primarily attack the individual pieces of evidence put forward by the Secretary, and then also make passing reference to record evidence of their own that they say creates a genuine dispute of material fact.

---

definition of the term.

[7] Because summary judgment will only be granted as to Central Laundry's liability during the portion of the relevant time period that occurred before March 20, 2018, any finding of liability as to any particular provision of the FLSA—for example, here, the minimum wage provision—is subject to that limited time period as well.  However, where otherwise appropriate, the Court will continue to refer to all three defendants as "Defendants."

Beginning with the Secretary's evidence, he first points to the Request for Admissions to which Defendants did not respond.  In the Request for Admissions, the Secretary asked Defendants to admit that "[d]uring the relevant time period, Defendants paid individuals listed in Schedule A . . . at rates of $6.00 an hour."[8]  Because Defendants failed to respond to the First Request for Admissions, this fact is admitted.  Fed. R. Civ. P. 36(a)(3).  Moreover, even Defendants' efforts to rebut this admission—by noting in their Statement of Disputed Facts that employee Adam Nickels is listed on Schedule A and was paid $15.00 per hour—fail to meaningfully respond.  Accepting as true Defendants' claim about Nickels's pay rate, the fact admitted in the First Request for Admissions is not that *every* individual on the list was paid $6.00 per hour, but rather that there are some individuals on the list who were paid $6.00 per hour.  Nickels's rate of pay says nothing about whether any of the remaining 39 individuals on Schedule A were paid below the minimum wage.

The Secretary also points to numerous sworn declarations from Defendants' former employees, who testified that Defendants did not pay them for some weeks of work, paid them late for other weeks of work, and would issue checks to employees that bounced and would remain unpaid.  As to checks issued before March 2018, Defendants "admit that James Rengepes issued certain checks to employees of Central Laundry that employees were unable to cash because of insufficient funds."  This admission—on its own—constitutes a violation of the FLSA's minimum wage provisions.  *See Selker Bros.*, 949 F.2d at 1299 (violation occurs where employees do not "receiv[e] their proper wages at the time they were due").  As to checks issued after March 2018, Defendants deny that they failed to pay employees or issued checks that bounced because, they state, "Central Laundry ceased operations in early March 2018."  But, for

---

[8] Schedule A, attached to the Complaint and subsequently amended, lists former employees of Defendants.

the reasons already discussed, James and George remained employers for purposes of the FLSA after March 2018, and therefore this denial does not rebut or undercut the Secretary's evidence.

Finally, the Secretary points to the testimony of Abraham Torres, the general manager at Central Laundry. Torres testified that various Hispanic and Cambodian employees were paid between $6 and $7 per hour and that those employees were "not on payroll." Defendants urge rejection of the Torres testimony as hearsay, and therefore as not competent evidence at summary judgment. *See Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 226 n.7 (3d Cir. 2000) (noting that only evidence that would be admissible at trial is competent for consideration at summary judgment). "Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted," *United States v. Sallins*, 993 F.2d 344, 346 (3d Cir. 1993), but "[t]estimony that conveys a witness's personal knowledge about a matter is not hearsay," *United States v. Vosburgh*, 602 F.3d 512, 539 n.27 (3d Cir. 2010). Because the cited portions of Torres's statements appear to be based on personal knowledge,[9] his statements are not hearsay.[10]

---

[9] Torres makes one statement related to employee pay rates that appears to be not based on personal knowledge. Although Defendants do not identify this statement in their briefing (that two employees told Torres they were being paid $6 per hour), the Court will not rely on it in deciding whether Defendants violated the minimum wage provisions of the FLSA.

[10] Beyond the evidence just recounted, the Secretary also relies (here, and elsewhere in his briefing) on this Court's factual findings at the preliminary injunction hearing, suggesting that those findings support summary judgment here. To support this argument, the Secretary cites *McTernan v. City of York*, 577 F.3d 521 (3d Cir. 2009), where the Third Circuit noted "a district court's findings and conclusions on a preliminary injunction motion could have preclusive effect if the circumstances make it likely that the findings are 'sufficiently firm' to persuade the court that there is no compelling reason for permitting them to be litigated again[,]" and where "circumstances make it likely that the findings are accurate and reliable." *Id.* at 530-31 (internal quotation marks omitted). However, the *McTernan* panel immediately went on to emphasize that preliminary injunction findings do not have preclusive effect in ordinary circumstances—rather, it is a "rare" case where they will have that effect. *Id.* at 531. The Secretary has not offered any persuasive reason (or, for that matter, any reason at all), why this is such a "rare" case. Because "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), and because district courts ruling on motions for preliminary injunctions may consider "affidavits and other hearsay materials" that would not be admissible at trial, *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004), the Court here will neither adopt nor rely upon its findings at the preliminary injunction hearing in ruling on the motion for summary judgment. Of course, the Court's factual findings at the hearing and witness testimony at the hearing are not to be confused

14

In addition to attacking the individual pieces of evidence offered by the Secretary, Defendants also point to two affirmative pieces of evidence of their own, which they say create a genuine dispute of material fact as to violations of the minimum wage provisions: James's testimony that his employees are "paid more than the minimum wage," and a "document showing that employees were paid in cash at a rate of at least $7.25 per hour."

James's statement that employees were "paid more than the minimum wage" says nothing about whether Defendants violated the FLSA's minimum wage provisions by paying employees late, issuing checks that would bounce, or denying pay altogether for weeks that employees worked (indeed, Defendants admit that they did just that).[11] And the "document" to which Defendants point—almost 400 pages of unorganized payroll information that covers only a fraction of the relevant time period—does not support Defendants position. For one, Defendants have offered no explanation for how this document supports their position, nor citation to a particular portion of the document that the Court should analyze. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record[.]"). Indeed, the full extent of Defendants' argument is the following direct quotation from their brief: "Defendants have also produced a document showing that employees were paid in cash at a rate of at least $7.25 per hour. JA 796-1190." This argumentation is inadequate at summary judgment; a non-moving party cannot establish a genuine dispute of material fact by waving its hands at almost 400 pages of

---

with one another; reliance on witnesses' sworn testimony made at the preliminary hearing remains just as appropriate as reliance on witnesses' sworn testimony made at a deposition, at trial, or anywhere else.

[11] Moreover, "[a]s a general proposition, 'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment[,]'" *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009))—a proposition that is often extended to deposition testimony, *see, e.g.*, *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011); *Danois v. i3 Archive Inc.*, 2013 WL 3556083, at *10 (E.D. Pa. July 12, 2013); *Houston v. Dialysis Clinic, Inc.*, 2015 WL 3935104, at *14 (D.N.J. June 26, 2015).

documentation, without any accompanying argument, explanation, or specification. As the Third Circuit as "oft-noted," the parties "bear the responsibility to comb the record and point the Court to the facts that support their arguments." *United States v. Claxton*, 766 F.3d 280, 307 (3d Cir. 2014); *see id.* ("Judges are not like pigs, hunting for truffles buried in the record."). And even beyond the procedural inadequacy of Defendants' argument, it is also critical to note that Defendants have acknowledged that they repeatedly violated the FLSA's recordkeeping provisions, both in this case and in *Central Laundry I*, and that there is extensive testimony from both Angeliki and Torres indicating that Defendants doctored their payroll records and that Defendants' payroll records are otherwise unreliable.

At base, on the evidence that the parties have presented, a "reasonable jury" could not return a verdict for Defendants on the minimum wage claim. *Anderson*, 477 U.S. at 251; *see also Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (To survive summary judgment "a nonmoving party must adduce more than a mere scintilla of evidence in its favor[.]"). Therefore, summary judgment will be granted to the Secretary on the question of whether Defendants violated the minimum wage provision of the FLSA.[12]

---

[12] The Secretary also seeks summary judgment as to whether Defendants' violations of the minimum wage provisions of the FLSA were "willful." An employer "willfully" violates the FLSA if it "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). "Acting only 'unreasonably' is insufficient—some degree of actual awareness is necessary." *Souryavong v. Lackawanna County*, 872 F.3d 122, 126 (3d Cir. 2017) (quoting *McLaughlin*, 486 U.S. at 133). Defendants do not explicitly argue that their conduct was not "willful"—but opposition to summary judgment can be inferred from the fact that they contest whether they had committed the underlying violation. In any event, no reasonable juror could conclude that Defendants lacked "some degree of actual awareness" that failure to pay the minimum wage violated the FLSA. Defendants have already admitted to violating this provision of the FLSA in *Central Laundry I*, and the Court already determined that the minimum wage violations committed by Defendants in that case were "willful." *Central Laundry I*, No. 15-1502, ECF No. 56. Defendants were further put on notice when a preliminary injunction was issued in this case prohibiting them from committing these same violations. Therefore, Defendants were aware of this requirement in the FLSA, and their violation of it was "willful" for purposes of the Act.

### D. Overtime

The Secretary moves for summary judgment as to whether Defendants violated the overtime provisions of the FLSA. The FLSA requires that "for a workweek longer than forty hours," employers compensate employees "at a rate not less than one and one-half times the [employee's] regular rate[.]" 29 U.S.C. § 207(a)(1). In support of summary judgment on this issue, the Secretary points to the following undisputed evidence: Defendants' failure to respond to the Secretary's First Request for Admissions, which included the admission that "Defendants did not compensate the individuals listed in Schedule A . . . at rates not less than one and one-half times the regular rates at which they were compensated for those workweeks in which the named individuals worked in excess of forty hours,"; the testimony of James Rengepes, who stated that he failed to pay overtime to at least five employees; and sworn testimony of various former employees of Defendants, who stated they were not paid at 1.5 times their ordinary rate when they worked more than 40 hours per week, and that they were never paid at all for certain hours worked in excess of 40 per week.

Defendants only contest the probative nature of the Request for Admissions,[13] and they make two arguments to that effect.[14] First, Defendants assert that "the request does not establish that any employee listed on Exhibit A worked more than 40 hours in any given workweek." Even so, the Secretary presents significant other evidence—in the form of James's testimony and

---

[13] In their Statement of Undisputed Facts, Defendants also purport to dispute the statements from former employees about whether those employees were paid overtime. However, Defendants make clear in their Statement of Undisputed Facts that their only dispute is that these statements do not "support the proposition that anyone was paid less than the minimum wage"—not that they fail to support a claim of overtime violations. Accordingly, for purposes of the overtime issue, the employee statements will be taken as undisputed.

[14] It bears noting again that although the Court will examine Defendants' substantive arguments and explain why they do not create a genuine dispute of material fact, Defendants' failure to timely (or ever, it appears) respond to the Secretary's Request for Admissions that Defendants "did not compensate the individual listed in Schedule A" for overtime means that the admission is "conclusively established" and "therefore an unassailable statement of fact that is binding on the non-responsive party." *Kwasny*, 853 F.3d at 91.

that of various other former employees—to show that Defendants' employees indeed worked more than 40 hours per week. What the admission does demonstrate—and what Defendants' fail to address—is that when employees *did* work more than 40 hours per week, Defendants did not pay them overtime.

Second, Defendants assert that "other competent evidence in the record refutes the notion that all individuals listed in Exhibit A . . . were not properly compensated for overtime"— specifically that "Central's payroll register reflects" that at least five individuals were paid overtime. True enough; but this argument is beside the point. That certain employees on the list were properly compensated for some of the time they worked for Defendants does not raise a material issue of fact as to whether Defendants properly compensated other employees on the list—some of whom Defendants admitted to improperly compensating and some of whom testified that they were improperly compensated.

In sum, no issue of material fact exists as to whether Defendant violated the overtime provisions of the FLSA. Therefore, summary judgment will be granted to the Secretary and against Defendants on the issue of liability for failure to provide overtime compensation under the FLSA.[15]

### E.  Child Labor

The Secretary seeks summary judgment as to Defendants' violations of the child labor provisions of the FLSA. The FLSA prohibits "any oppressive child labor in commerce or in the production of goods for commerce or in any enterprise engaged in commerce or in the

---

[15] The Secretary also requests summary judgment as to whether Defendants' violations of the overtime provisions were "willful." As in the minimum wage context, the undisputed facts demonstrate that Defendants acted with at least "some degree of actual awareness" that failure to pay overtime violated the FLSA. In short, Defendants had already been found liable for violating the FLSA's overtime provisions, and therefore it cannot seriously be argued that they lacked subjective knowledge of the law. And in any event, Defendants' do not affirmatively contend that any violations were not "willful." Summary judgment will be granted in favor of the Secretary on the question of whether Defendants' overtime violations were willful.

production of goods for commerce." 29 U.S.C. § 212(c). Subject to certain exceptions not at issue here, employment of any child under the age of sixteen constitutes oppressive child labor. *Id.* at § 203(l). Both parties present some record evidence in support of their respective positions.

The Secretary offers various pieces of evidence supporting summary judgment. For one, Angeliki offered sworn testimony that she witnessed "little kids with glasses and braces" folding towels at the work site, that she thought the children looked "not a day over 14[,]" and that she was so angered by the presence of children at the worksite that she eventually called the police. The Secretary also points to the testimony of Torres, who stated that he believed a thirteen-year-old, a fifteen-year-old, and a sixteen-year-old worked at Central Laundry, and that he knew the ages of these children because they had told him their ages. Finally, the Secretary points to the testimony of Adam Nickels, a former driver at Central Laundry, who stated that there were three girls working at Central Laundry who he believed to be minors, that James had told him that one of them was a minor, that "other employees" had told him that the remaining two girls were minors, and that he believed that these two individuals were minors.

Defendants challenge the admissibility of each witness's testimony, and they also point to affirmative evidence of their own: James's testimony in which he stated that he does not hire minors, and that in his hiring process he "review[s] documentation that includes dates of birth."

The Court need not address whether each piece of the Secretary's evidence would be admissible at trial. Even accepting, *arguendo*, that all of the Secretary's evidence is admissible, a genuine question of material fact exists. That is because James's testimony, particularly with regard to defining the "review" of documentation, is more than purely "conclusory," *Gonzalez*,

678 F.3d at 263.  Because a reasonable jury evaluating this record could come to a verdict for Defendants, summary judgment must be denied.

### F. Retaliatory Termination

The Secretary contends that Defendants violated the anti-retaliation provisions of the FLSA when they fired Adam Nickels because he spoke to Wage and Hour investigators about Defendants' FLSA violations.  Under the FLSA, it is "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has . . . caused to be instituted any proceeding under or related to this chapter, or has testified . . . in any such proceeding[.]"  29 U.S.C. § 215(a).

To establish a prima facie retaliation case under the FLSA, "a plaintiff must show that (1) the plaintiff engaged in protected activity, (2) the employer took an adverse employment action against him, and (3) there was a causal link between the plaintiff's protected action and the employer's adverse action."  *Kovach v. Turner Dairy Farms, Inc.*, 929 F. Supp.2d 477, 499 (W.D. Pa. 2013) (quoting *Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936, 939 (3d Cir. 2003)); *see also Shakib v. Back Bay Restaurant Grp., Inc.*, 2011 WL 4594653, at *7 (D.N.J. Sept. 30, 2011).  Defendants concede that Nickels engaged in protected activity when he spoke with Wage and Hour investigators, but argue that he did not suffer an adverse employment action because, according to Defendants, Nickels quit his job—they did not fire him.[16]

---

[16] The Secretary again relies on *McTernan v. City of York* to urge that the Court give preclusive effect to its determination at the preliminary injunction hearing that Nickels was fired.  *See* 577 F.3d at 530-31.  For the reasons discussed *supra* note 9, that factual determination will not be given preclusive effect.

Based on only this evidence, a reasonable jury could credit James's testimony and conclude that Nickels was not involuntarily terminated. Therefore, summary judgment must be denied on this issue.[17]

### G. Damages Calculations

The Secretary seeks summary judgment as to the amount of Defendants' liability; specifically, for $133,335 in back wages for willful minimum wage and overtime violations, and another $133,335 in liquidated damages. Where, as here, the "fact of damages" is "certain," *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 687 (1946), and the employer failed to keep employment records as required by the FLSA such that aggrieved employees relying on those inadequate or nonexistent records would "have no way to establish the time spent doing uncompensated work," *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016), courts apply a burden shifting analysis to apportion damages. The burden shifting framework—first outlined by the Supreme Court in *Mt. Clemens* and known by that name—imposes a "minimal" initial burden on the employees, *Sec'y of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991), and then requires "precise" evidence from employers in rebuttal, *Selker Bros.*, 949 F.2d at 1298. A modest burden is imposed on employees and then a more stringent rebuttal burden on employers because the "'remedial nature of [the FLSA] and the great public policy which [the FLSA] embodies . . . militate against making' the burden of proving uncompensated work 'an impossible hurdle for the employee.'" *Tyson Foods*, 136 S. Ct. at 1047 (quoting *Mt. Clemens*, 328 U.S. at 687); *see also Monroe v. FTS USA, LLC*, 860 F.3d 389, 412 (6th Cir. 2017) (employees should not be "penalize[d] . . . for an employer's failure to keep adequate records").

---

[17] Because summary judgment is denied on the retaliatory firing issue, the Court need not address whether Nickels is entitled to damages resulting from that firing.

"The Secretary's burden . . . is merely to present a prima facie case." *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 702 (3d Cir. 1994). He will have "carried out his burden if he proves that [employees have] in fact performed work for which [they were] improperly compensated and if he produces sufficient evidence to show the amount and extent of that work *as a matter of just and reasonable inference*." *Selker Bros.*, 949 F.2d at 1297 (quoting *Mt. Clemens*, 328 U.S. at 687) (emphasis added). The Secretary need not "bring every employee seeking back wages to court to testify"; rather, "the Secretary can rely on testimony and evidence from representative employees to meet the initial burden of proof requirement." *Id.* (citing *Mt. Clemens*, 328 U.S. at 680); *see also Gateway Press*, 13 F.3d at 702 ("[N]ot all employees need to testify in order to prove the violations or to recoup back wages."); *Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 86 (10th Cir. 1983) (representative testimony of twelve employees supported damages award for all former employees); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1278-79 (11th Cir. 2008) (collecting cases). Moreover, "[t]here is no requirement that to establish a *Mt. Clemens* pattern of practice, testimony must refer to all nontestifying employees[,]" as "[s]uch a requirement would thwart the purposes of the sort of representational testimony clearly contemplated by *Mt. Clemens*." *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985). A prima facie case may be established based solely upon an employee's "credited testimony." *Wirtz v. Durham Sandwich Co.*, 367 F.2d 810, 812 (4th Cir. 1966); *see also Etienne v. Ameri Benz Auto Serv. LLC*, 2016 WL 1222569, at *6 (D. Md. Mar. 29, 2016).

Once the plaintiff establishes this prima facie case, "[t]he burden . . . shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to

the employee, even though the result may be only approximate." *Selker Bros.*, 949 F.2d at 1297

(quoting *Mt. Clemens*, 328 U.S. at 687-88). The reasonableness of a proposed damages

calculation "depends in part on the availability of other, more reasonable alternatives to that

proposal." *Acosta v. Off Duty Police Servs. Inc.*, 915 F.3d 1050, 1065 (6th Cir. 2019).

To establish his prima facie case, the Secretary relies on the payroll records maintained

by Torres, Torres's testimony at the preliminary injunction hearing, Nickels's testimony at the

preliminary injunction hearing, statements provided by three employees, sworn declarations

provided by six employees, and the testimony of George, James, and Angeliki Rengepes. The

calculations work as follows.

The Secretary estimates that there were 32 "positions available" during the relevant time

period, based on testimony from Torres and James that as few as 16 employees and as many as

45 employees worked at Central Laundry during the relevant time period. The Secretary

estimates that, of those 32 positions, 7 were occupied by Cambodian laundry workers who were

paid a regular rate of $7 per hour, 8 were occupied by Hispanic laundry workers who were paid a

regular rate of $6 per hour, 11 were occupied by other laundry workers who were paid a regular

rate of $7.25 per hour, 4 were occupied by drivers who were paid a regular rate of $7.25 per

hour, and 2 were occupied by mechanics who were paid a regular rate of $15 per hour; these

estimates are based on Torres's testimony and payroll records, and on testimony from laundry

workers, drivers, and mechanics.[18] The Secretary additionally infers that on average employees

worked 50 hours per week, based on testimony and declarations from workers, and on Torres's

payroll records, each of which shows that employees worked anywhere from 40 to 90 hours in a

---

[18] In support of its estimates of the payrates of Hispanic and Cambodian employees, the Secretary also states that "[t]his [C]ourt has already found that employees of Hispanic and Cambodian descent were paid between $6.00 and $7.00 an hour." This finding, however, was made in the context of the preliminary injunction and, for the reasons already discussed *supra* note 9, will not be the basis for any further findings at summary judgment.

week.[19]  The Secretary states that employees were ordinarily not paid overtime, based on

Torres's testimony, Nickels's testimony, and the testimony of a Wage & Hour investigator

employed by the Secretary.[20]  The Secretary estimates that on average employees were not paid

by Defendants for three full weeks of work over the course of an employee's time working for

Defendants during the relevant time period, based on testimony from numerous employees

stating that each were due between 2 and 4 weeks of pay from Defendants, and based on James's

testimony that employees would sometimes miss paychecks.

Putting these estimates together—that is, compensating each of the 32 employees over 57

of the 60 weeks of the "relevant time period" (assuming 3 pay periods were skipped) for 50

weekly hours of wages below the minimum wage (*e.g.*, paying workers making a regular rate of

$6/hour an additional $1.25/hour), and overtime (*e.g.*, paying all employees 10 hours of overtime

per week worked), and then adding three full weeks of pay to make up for the pay periods that

were entirely skipped, the Secretary comes to a total liability of $133,335.

Defendants question five of the assumptions used in the Secretary's calculations: the total

number of employees, the length of the relevant time period, the number of Hispanic and

Cambodian employees paid below minimum wage, the number of mechanics, and the length of

an average workweek.  While Defendants' arguments vacillate between appearing to challenge

whether the Secretary has met his burden of establishing a "prima facie" case based on "just and

reasonable inference," and appearing to attempt to meet Defendants' own burden of "com[ing]

forward with evidence of the precise amount of work performed or with evidence to negative the

---

[19] Indeed, an estimate of fifty hours per week may be fairly conservative, given the extensive testimony claiming hours worked far beyond fifty per week.

[20] Relatedly, the Secretary also points to record evidence showing that James repeatedly manipulated employees' time records in Defendants' payroll system to reflect fewer hours and to avoid paying overtime.

reasonableness of the inference to be drawn from [the Secretary's] evidence," *Mt. Clemens*, 328 U.S. at 687-88, ultimately Defendants fail to do either.

First, Defendants attack the estimated total number of employees as "unsupported guesswork." They note that James had testified that at various times Central Laundry employed as few as 26 or 19 employees, and they question Torres's credibility (who had testified that as many as 45 employees worked at Central Laundry). But James's testimony and any question about the accuracy of Torres's employee count were already incorporated into the Secretary's estimations—the final figure of 32 employees was the result of taking the average of the low-end estimate and the high-end estimate. Defendants have thus neither shown that the Secretary's initial "minimal burden" went unsatisfied, *see DeSisto*, 929 F.2d at 792, nor "come forward with evidence of the precise" number of employees "to negative the reasonableness of the inference to be drawn" from the Secretary's evidence, *Selker Bros.*, 949 F.2d at 1297 (quoting *Mt. Clemens*, 328 U.S. at 687-88). *See also Monroe*, 860 F.3d at 412 ("Disapproving of an estimated-average approach simply due to lack of complete accuracy would ignore the central tenant of *Mt. Clemens*—an inaccuracy in damages should not bar recovery for violations of the FLSA or penalize employees for an employer's failure to keep adequate records.").

Defendants next question the length of the relevant time period. This argument appears to be an attempt to "negative" the reasonableness of the Secretary's inference that minimum wage and overtime violations occurred for the full 60-week period. Defendants contend that because Central Laundry closed in March 2018, the relevant time period ends at that point. At least as to James and George, who remained employers for purposes of the FLSA at GNNE, this argument has already been rejected.[21] They also argue that Angeliki closed GNNE on August 6,

---

[21] As already discussed, summary judgment will not be granted to the Secretary on the issue of whether Central Laundry was an enterprise covered by the FLSA after March 20, 2018. Consequently, summary judgment also

2018, three weeks earlier than the August 28, 2018 date put forth by the Secretary. But the record citation on which Defendants rely, sworn testimony offered by Angeliki on August 15, 2018, does not support the proposition for which it is offered: When asked whether Angeliki had "filed any paperwork at all to shut down the business officially," she answered "[n]ot yet, no[.]" As a result, Defendants have failed to carry their burden of "com[ing] forward with evidence of the precise amount of work performed or . . . to negative the reasonableness" of the Secretary's inference. *Selker Bros.*, 949 F.2d at 1297 (quoting *Mt. Clemens*, 328 U.S. at 687-88).

Defendants then assert that the Secretary's estimates of how many Cambodian and Hispanic employees were paid beneath the minimum wage, and how many hours those employees worked, are not supported by the record. They argue that the only evidence relating to these assumptions comes from the Court's findings at the preliminary injunction hearing— findings that should be disregarded at summary judgment.[22] But the Secretary did not rely solely on this Court's factual findings. Instead, the Secretary also points to Torres's sworn testimony, Torres's records, and Nickels's testimony. Therefore, the Secretary has established its prima facie case. And Defendants have not come forward with evidence of their own to rebut that case, meaning that they have failed to meet their burden.

Defendants also argue that the record only supports one mechanic working for Central Laundry at any given time, not two. But the Secretary identified not just one or two, but four different individuals who worked in some capacity as mechanics, and it appears that some of those mechanics' tenures with Central Laundry overlapped. Again, the Secretary has presented "sufficient evidence" to establish a prima facie case. While it is surely an "inference" or an "approximat[ion]" to say that there were two mechanics working for Defendants throughout the

---

cannot be granted as to Central Laundry's liability for damages incurred after that date.

[22] For the reasons discussed *supra* note 9, the Court agrees that such findings should be disregarded here.

relevant time period, *Mt. Clemens*, 328 U.S. at 488, Defendants bear the burden of offering "precise" evidence to the contrary. *Id.* By offering only the assertion that the record does not adequately support the Secretary's position, Defendants have failed to meet their burden.

Finally, Defendants contest the Secretary's estimate of a 50-hour work week for each employee. But the extent of Defendants' argument is to obliquely question "Mr. Torres' less than reliable testimony[.]" As already noted, where the "fact of damages" is "certain," *Mt. Clemens*, 328 U.S. at 687, and employees cannot rely on the employers' records to "establish time spent doing uncompensated work" because the records are incomplete or inaccurate, *Tyson Foods*, 136 S. Ct. at 1047, then Defendants must point to record evidence to undermine the Secretary's position. Here, they have not done so.

Beyond contesting individual pieces of the Secretary's damages estimation (argumentation that, for the reasons just discussed, is ultimately unpersuasive), Defendants do not present any other "alternatives," let alone "reasonable alternatives," to the Secretary's proposal. *Off Duty Police Servs.*, 915 F.3d at 1065 (noting that the reasonableness of a plaintiff's damages estimate under the *Mt. Clemens* framework "depends in part on the availability of other, more reasonable alternatives to that proposal").

In sum, under the *Mt. Clemens* burden shifting framework, the Secretary has satisfied his burden by "produc[ing] sufficient evidence to establish that the employees have in fact performed work for which they were improperly compensated and . . . to show the amount and extent of that work 'as a matter of justice and reasonable inference.'" *S. New England Telecomms.*, 121 F.3d at 67 (quoting *Mt. Clemens*, 328 U.S. at 687-88). And, once the burden shifted to Defendants, they failed to produce evidence of the "'precise amount of work performed or . . . evidence to negative the reasonableness of the inference to be drawn from the

[Secretary's] evidence." *Selker Bros.*, 949 F.2d at 1297 (quoting *Mt. Clemens*, 328 U.S. at 687-88). This failure allows the Court to "award damages to the employees, even though the result be only approximate." *Mt. Clemens*, 328 U.S. at 687-88. Therefore, summary judgment will be granted to the Secretary on its damages calculation.[23]

### H. Liquidated Damages

The Secretary seeks summary judgment as to Defendants' liability for $133,335 in liquidated damages. An employer who violates the minimum wage or overtime provisions of the FLSA "shall be liable" both for any unpaid compensation "and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b); *see also Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991). However, a District Court may "in its sound discretion, award no liquidated damages" or reduce the amount, "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the FLSA action] was in good faith and that [the employer] had reasonable grounds for believing that [the] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. "Ignorance alone will not exonerate the employer," *Cooper Elec.*, 940 F.2d at 908 (quoting *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984)), and "[t]o carry [its] burden, a defendant employer must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless, violated it provisions[,]" *id.* at 908. Defendants make no argument that their violations of the FLSA were in good faith. Even if they had, there is no plausible argument to support that contention. At the time the events that give rise to this action occurred, Defendants had already admitted to violating the FLSA in *Central Laundry I* and had been ordered by this Court to cease violating the FLSA; thus, Defendants

---

[23] Because summary judgment is only granted against Central Laundry as to violations occurring before March 20, 2018, Central Laundry only accrues liability for 275 of the 420 days in the "relevant time period." The 275 days represent 65% of the relevant time period, or $86,667.75 in back wages under the Secretary's calculations. Therefore, Central Laundry will be liable for $86,667.75 in back wages.

cannot assert ignorance of the FLSA's strictures, let alone reasonable grounds for believing that their actions did not violate the FLSA. Summary judgment will therefore be granted as to Defendants' liability for $133,335 in liquidated damages.[24]

## I.  Permanent Injunction

The FLSA provides for injunctive relief to "restrain violations" of the minimum wage, overtime, recordkeeping, and child labor requirements of the Act. 29 U.S.C. § 217. Injunctive relief is a discretionary matter, but in "exercising its discretion [a court] should consider: (1) the previous conduct of the employer; (2) the current conduct of the employer; and (3) the dependability of the employer's promises for future compliance." *Reich v. Petroleum Sales, Inc.*, 30 F.3d 654, 657 (6th Cir. 1994); *see also A-1 Mortg. Corp.*, 934 F. Supp.2d at 815. This Court has already issued an injunction against Defendants in *Central Laundry I*, after noting "Defendants' repeated failure to comply with the FLSA," the "scale of their FLSA violations that affected numerous employees," the fact that the Court had "recently granted preliminary injunctive relief," and Defendants' lack of objection to injunctive relief. Here, Defendants' conduct is egregious, repeated, and likely to continue. Moreover, Defendants' briefing does not respond to the Secretary's request for an injunction. Therefore, Defendants will be enjoined from further violations of the provisions of the FLSA for which they have been found liable in this opinion—that is, they will be enjoined from violating the minimum wage, overtime, and recordkeeping provisions.

---

[24] Because summary judgment is only granted against Central Laundry liability for $86,667.75 in back wages, *supra* note 22, only that same amount may be awarded against Central Laundry in liquidated damages. 29 U.S.C. § 216(b) (noting that violators "shall be liable" for liquidated damages in an amount "equal" to their liability for unpaid compensation). Therefore, summary judgment is granted against Central Laundry in the amount of $86,667.75.

## IV.    CONCLUSION

For the foregoing reasons, summary judgment will be granted to the Secretary on Central Laundry's status as a covered enterprise under the FLSA until March 20, 2018; James and George's status as covered employers under the FLSA during the full relevant time period; Defendants' violations of the FLSA's minimum wage provisions; Defendants' violations of the FLSA's overtime provisions; Defendants' violations of the FLSA's recordkeeping provisions, the willfulness of Defendants' minimum wage, overtime, and recordkeeping violations; Defendants' liability for $133,335 in back wages for minimum wage and overtime violations, of which James and George are jointly and severally liable for the full amount and Central Laundry is jointly and severally liable for $86,667.75 of that amount; Defendants' liability for $133,335 in liquidated damages, of which James and George are jointly and severally liable for the full amount and Central Laundry is jointly and severally liable for $86,667.75; and the Secretary's request for a permanent injunction.

Summary judgment will be denied on Central Laundry's status as a covered enterprise under the FLSA after March 20, 2018, Defendants' violations of the FLSA's child labor provisions, Defendants' violations of the FLSA's anti-retaliation provisions, and Defendants' liability for front pay to Adam Nickels.

An appropriate order follows.


**July 29, 2019**                                        **BY THE COURT:**



                                                         _____
                                                         **WENDY BEETLESTONE, J.**